UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROGER L. MAINE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:07CV1074 CDP |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Roger Maine's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Maine claims that he is disabled because he suffers from hernia residuals, severe lower back pain, and hypertension, among other impairments. The Administrative Law Judge, however, found that Maine was not disabled. Because the Administrative Law Judge did not adequately develop the record in determining that Maine could return to his past relevant work, I will reverse the ALJ decision and remand to the Commissioner for another hearing.

## Procedural History

Maine filed applications for a Period of Disability and Disability Insurance Benefits on May 16, 2005. The Social Security Administration initially denied his applications on July 28, 2005, and Maine timely filed a request for a hearing. On July 26, 2006, the ALJ issued an opinion upholding the denial of benefits. The Social Security Administration Appeals Council denied Maine's request for further review on April 13, 2007. The ALJ's decision thus stands as the final determination of the Commissioner. Maine filed this appeal on October 10, 2007.

## Testimony Before the Administrative Law Judge

At the time of the ALJ's decision, Maine was fifty-seven years old and lived alone. He has completed eleven years of education. Maine has previously worked as a laborer, sanitation worker, and maintenance worker.

Maine testified to constant arthritic pain in his lower back extending down through the backs of his legs and into his feet. He said that the pain increased with movement, long periods of sitting, and standing. Maine stated that the back pain limited his ability to lift, bend over, and stoop. Additionally, Maine described that his left knee occasionally "popped out," causing him to fall.

Maine testified that he suffered from frequent chest pains caused by heart problems, including high blood pressure. He stated that he felt sharp pain in his

left chest when walking or bending over often. Maine complained of daily headaches and a severe depletion of strength and stamina compared to the past. He stated that it bothered him even to carry his eight-pound vacuum cleaner across the room. Maine described pain from two past hernias. Lifting too much weight aggravated this hernia pain. Further, Maine described frequent difficulty of breathing, which often caused him to awake at night to take a "heart pill."

Maine testified that his daily activities were few, including occasionally walking sixty to seventy feet over to his sister's home. He stated that his sister and other friends completed most of the work around his home, which he described as a trailer. Further, Maine asserted that he rarely left his home other than to go to lunch when a friend would take him out.

## Medical Records

Dr. David T. Volarich evaluated Maine on July 31, 2003 in an independent consultative medical examination. Dr. Volarich examined Maine for work-related limitations caused by a previous hernia suffered in April 2000. Maine had the hernia surgically repaired at Phelps County Regional Medical Center and was allowed to return to work in June 2000. Finding that Maine's hernia impairments limited his ability to work, Dr. Volarich recommended that Maine should handle weight less than twenty-five to thirty-five pounds and limit vigorous pushing,

pulling, lifting, and carrying.  Additionally, Dr. Volarich recommended that Maine should pursue an abdominal wall exercise program involving crunches and leg lifts.

Dr. Don S. Pruett evaluated Maine in a consultative capacity on December 12, 2003.  Dr. Pruett believed that Maine had not reached medical maximum improvement regarding his hernia.  He noted that removal of the mesh graft from the prior hernia surgery would improve Maine's painful condition.  Without this surgery, Dr. Pruett felt an appropriate disability rating would be three percent.

On January 7, 2005, Maine presented to Dr. Myers, whose notes indicate that it was a "work up for employment."  The notes reflect that Dr. Myers had treated Maine as far back as August 1995, but that his last examination of Maine was in July 1999.  Dr. Myers' notes indicate that Maine had a knee injury, blood pressure of 160/100, a large right hydrocele, and right ear chronic otitis media.[1]  Maine complained of increased back pain as well.  Dr. Myers ordered chest x-rays, which found Maine's cardiac silhouette and bony thorax unremarkable.  In addition, the x-rays revealed no acute process or interval change.

Dr. Arthur P. Greenberg completed a consultative examination of Maine for

---

[1] "inflammation of the middle ear, or tympanum."  Stedman's Medical Dictionary 1112 (25th ed. 1990).

the Missouri Disability Determination Division, as evidenced in his July 20, 2005 letter. The examination revealed a blood pressure of 148/91, reduced hearing acuity, and reduced range of motion. Dr. Greenberg also found tenderness in Maine's left knee and shoulder consistent with degenerative arthritis and possible internal derangement. Dr. Greenberg noted that Maine had chest pain with symptoms suggestive of cardiac disease, as well as hypertension.

Maine presented to Dr. Myers again on September 13, 2005. Notes from this visit reveal that Maine continued to complain of lower back pain, left knee pain, and chest pain. Dr. Myers noted that Maine was previously taking Diovan, but that he had not taken medication for six months because of limited funds. Dr. Myers ordered x-rays of Maine's lumbar spine and left knee. The lumbar spine x-ray revealed mild degenerative changes evidenced by minimal osteophyte formation at L4-5. The left knee x-ray found normal bones and joints without fracture or other abnormality.

Dr. Myers examined Maine again and completed a residual functional capacity assessment on December 6, 2005. Without explanation, Dr. Myers indicated that Maine could not work for more than one hour per eight-hour work day. Dr. Myers indicated "arthritis" as the specific medical reason that Maine should not work. Notes from the examination indicate that Maine continued to

complain of pain radiating from his lower back down through his feet.

Maine again presented to Dr. Myers on April 12, 2006. He complained of bilateral ankle pain, continued chest pain, and occasional shortness of breath. In his notes, Dr. Myers indicated degenerative joint disease of the ankles. Dr. Myers prescribed Diovan, Feldene, and Nitrostat, and he referred Maine to cardiologist Dr. Thomas Martin.

Dr. Martin initially examined Maine on April 19, 2006. Maine reported that he had quit smoking in November 2005 after having smoked since childhood, up to a pack a day at times. Maine stated that over several months he had experienced sharp chest pain, shortness of breath, and occasional nausea. Dr. Martin administered an electrocardiogram, which showed no acute changes, and he scheduled Maine for a stress Myoview study and Persantine stress test.

Dr. Martin administered the tests on April 25, 2006. The Perstantine stress test revealed a normal heart rate and blood pressure response, no chest pain, no arrhythmias, and no ECG changes. The Myoview study showed no evidence of myocardial ischemia,[2] normal systolic wall-thickening pattern, normal ejection fraction of 56%, normal right ventricular cavity size, and normal right ventricular

---

[2] "inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease." Stedman's Medical Dictionary 803 (25th ed. 1990).

free wall function.

After the hearing with the ALJ, Maine presented to Dr. Nikhat Salamat, a pulmonary-sleep doctor, on June 12, 2006. He saw Dr. Salamat upon the referral of Dr. Martin because of abnormal pulmonary function tests. Maine explained that his shortness of breath had worsened, and he could not walk more than a block without getting short-winded. Dr. Salamat indicated that Maine had emphysema with shortness of breath and airway reactivity on the pulmonary function tests, non-allergic perennial rhinitis,[3] gastroesophageal reflux disease, and possibly sleep apnea. Dr. Salamat prescribed Advair, Spiriva, and Claritin for Maine's breathing.

Dr. Salamat's July 5, 2006 notes indicate that Maine's breathing had improved under the recommended treatment but that his blood pressure was high at 190/100. In a follow-up visit on July 27, 2005, Maine's breathing was still better after using an inhaler. His blood pressure was 180/100, and he complained of fatigue and restless sleep, among other symptoms.

Maine presented to Dr. Salamat for another follow-up visit on August 10, 2006. Dr. Salamat diagnosed mild chronic obstructive pulmonary disorder,

---

[3] "inflamation of the nasal mucous membrane." Stedman's Medical Dictionary 1358 (25th ed. 1990).

improved after a bronchodilator that was then stable. He also noted Maine's chronic pain and his high blood pressure despite taking three medications. Maine reportedly told Dr. Salamat that he had not been able to find a job because of his lung problem. Dr. Salamat wrote, "I told him that because of his mild disease I think that should not be a problem." Dr. Salamat referred Maine to Dr. David Buvat for uncontrolled hypertension.

Before visiting Dr. Buvat, Maine presented to Dr. Myers on August 25, 2006 for continued lower back pain radiating through his legs and feet and continued pain in his left knee. Maine's blood pressure was 160/90. Dr. Myers's notes indicate insomnia, hyperlipemia,[4] and chronic obstructive pulmonary disorder, with current medications of Norvasc, Diovan, Feldene, Lopressor, Zantac, Lunesta, Claritin, Comvibent, and Advair.

Maine then presented to Dr. Buvat on August 29, 2006 for his uncontrolled hypertension. Dr. Buvat found that Maine's chronic obstructive pulmonary disorder was mild and that his chest pains did not cause angina-type discomfort. There was no evidence of coronary artery disease. Dr. Buvat placed Maine on Diovan 320/25. He stopped Maine's usage of Metoprolol, as he believed it might

---

[4] "Lipemia," which is "the presence of an abnormally large amount of lipids in the circulating blood. Stedman's Medical Dictionary 741, 884 (25th ed. 1990).

be contributing to Maine's sense of fatigue and shortness of breath. Dr. Buvat did not see a "clear-cut indication" for Maine to have a beta blocker. He noted that Maine had a seemingly strong bronchospastic component that was reversible with bronchodilators. Dr. Buvat also increased Maine's Norvasc dosage from 5 mg daily to 10 mg daily.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but it is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required, which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, then the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled. At this stage, the ALJ has a duty to investigate thoroughly the past relevant work, making explicit findings regarding its physical and mental demands and comparing these demands to the claimant's residual functional capacity. *See Sells v. Shalala*, 48 F.3d 1044, 1046 (8th Cir. 1995).

If the claimant cannot perform his past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Maine was not disabled, considering his residual

functional capacity and past relevant work. He issued the following specific

findings:

1. The claimant met the disability insured status requirements of the Act on April 1, 2004, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since April 1, 2004.

3. The medical evidence establishes that the claimant has residuals from previous repair of left inguinal hernia, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations of impairment-related limitations are only credible to the extent of the residual functional capacity found herein.

5. The claimant has the residual functional capacity to perform work related activities involving lifting/carrying of up to 20 pounds, with no frequent lifting of more than ten pounds. He can walk/stand for up to six hours in an 8-hour workday. (20 CFR [§] 404.1545).

6. The claimant's past relevant work as a floor maintenance worker did not require the performance of work related activities precluded by the above limitation(s) (20 CFR [§] 404.1565).

7. The claimant's impairments do not prevent the claimant from performing his past relevant work.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR [§] 404.1520(e)).

In reaching these findings, the ALJ determined that Maine's allegations of total disability were not credible. The ALJ found that Maine had a severe impairment, but not one that met or exceeded a listed impairment. Further, the ALJ granted no weight to the opinion of Dr. Myers, Maine's treating physician, that Maine should not work. The ALJ determined that this opinion was "totally unsupported by objective evidence and observations by other physicians." Rather, the ALJ found that Maine retained the capacity to perform exertionally "light" work as described in 20 CFR § 404.1567(c). The ALJ ultimately found that Maine was not disabled, because he could "perform the functional demands and job duties of a floor maintenance worker as he previously performed" them.

## Discussion

Maine asserts four main issues on appeal from the final determination. First, Maine claims the ALJ erred when he discredited Maine's subjective complaints and Dr. Myers's opinion. Second, Maine asserts the ALJ failed to consider the combined effects of his collective impairments. Third, Maine alleges

the ALJ improperly interjected his own opinion regarding the impairments, rather than relying on medical opinions. Fourth, Maine claims the ALJ erred in determining that Maine was able to perform his past relevant work. Because I find the ALJ inappropriately determined that Maine could perform his past relevant work, constituting error that warrants reversal and remand, I will not address Maine's other arguments in this memorandum.[5]

The Secretary has determined in Ruling 82-62 that an ALJ has a duty to "*fully* investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work." *Nimick v. Secretary of Health & Human Serv.*, 887 F.2d 864, 866 (8th Cir. 1989) (emphasis in original). Consistent with this ruling, the Eight Circuit has held that "[a] conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his . . . past work." *Sells*, 48 F.3d at 1046 (quoting *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991)).

---

[5] While this memorandum focuses on the evidence of Maine's past relevant work as compared to the residual functional capacity determined by the ALJ, I do not decide whether the ALJ's residual functional capacity determination was based upon substantial evidence.

The ALJ found Maine could lift or carry up to twenty pounds, with frequent lifting limited to no more than ten pounds. The ALJ also found Maine could walk or stand for up to six hours in an eight-hour work day. These findings coincide with a residual functional capacity to perform "light" work as described in 20 CFR § 404.1567(c).

The ALJ then looked to the SSA-3369-BK forms that Maine completed with his application for disability benefits, indicating that he worked as a floor maintenance worker with BGM Industries, Inc. from 1994 to 1995. In this form, Maine checked the boxes that indicate the heaviest weight he lifted in this job was twenty pounds, while he frequently lifted ten pounds. Citing this information, the ALJ ended the analysis, finding that Maine had the capacity to perform past relevant work as a floor maintenance worker.

The ALJ's decision, however, ignores the walking and standing requirements of Maine's past job as a floor maintenance worker. On the same form upon which the ALJ relies, Maine indicated that he regularly walked or stood for eight hours per day. He further indicated in the "Lifting and Carrying" section that he "lift[ed] brooms and mops for 8 hr. and ran a buffer machine."

These descriptions do not square with the ALJ's determination that Maine

could only walk or stand for up to six hours in an eight-hour work day. If Maine only has a residual functional capacity to stand for six hours per work day, then he cannot perform past work that required standing for eight hours per work day.

There is a potential contradiction among Maine's answers on the SSA forms. Maine indicated that in his job as a floor maintenance worker, he walked eight hours per day, stood eight hours per day, knelt two hours per day, crouched two hours per day, sat one hour per day, and crawled from one-to-two hours per day. If one combines the hours Maine reported to have walked, stood, knelt, crouched, sat, and crawled, the sum equals at least twenty-two hours. But Maine only reported working a total of eight hours per day. While different work days often call for different requirements, and some days require more of a given activity than others, the form does not allow for such distinctions. It simply allows for a number to be inserted next to each activity, representing the number of hours per day spent working in that manner. Still, the answers could be read to contradict one another.

Where the Eight Circuit has confronted this issue, it has found that inconsistent answers on the SSA forms require clarity from information sources other than the forms. *See Nimick*, 887 F.2d at 867. The ALJ, however, looked only to the forms and did not seek other sources of information for clarity.

One alternative source is Maine's testimony at the hearing:

Q Floor maintenance?
A Yes.
Q What's that?
A That's mopping, buffing floors, waxing floors with buffers.
. . .
Q You had to clean the floors and janitor work or clean --
A Or janitor work, buffers, waxers, and --
ATTY: That's heavy work too.
CLMT: It's a pain.
ATTY: All heavy work, Judge.
ALJ: All right.
CLMT: Yeah.
ALJ: All right.

While not overly informative, the testimony speaks mainly to activities requiring walking or standing. But "janitor work" could require any type of activity, and the testimony sheds limited clarity on the job's specific exertional requirements.

Another source of aid lies in the Dictionary of Occupational Titles, because regardless of the actual demands of his past floor maintenance job, if Maine can do "the same type of work as it is generally performed in the national economy," then he is not disabled. *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000). However, the ALJ did not rely on the Dictionary of Occupational Titles, likely because its closest job description to Maine's former position is "Floor Waxer,"

which is considered "medium" work.[6]  *See* Dictionary of Occupational Titles § 381.687-034 (1991), *available at* www.westlaw.com, 1991 WL 673262 ("Cleans, waxes, and polishes floors by hand or machine:  Removes dirt and blemishes from floor, using various cleaning solvents and compounds, according to composition of floor.  Applies paste or liquid wax to floor with rags or machine.  Polishes floor with electric polishing machine or weighted brush.").  The ALJ determined that Maine was limited to "light" work, so exclusive reliance on the Dictionary of Occupational Titles would mean that Maine could not return to his past floor maintenance worker job.

Considering the scarce, inconsistent evidence of the actual demands of Maine's past job as a floor maintenance worker, the ALJ's conclusory determination that Maine is able to return to this past relevant work was not based upon substantial evidence.  *See Sells*, 48 F.3d at 1046; *Groeper*, 932 F.2d at 1239; *Kirby v. Sullivan*, 923 F.2d 1323, 1327 (8th Cir. 1991).  A proper determination will require further development of the record.  To achieve this end, the ALJ may need to supplement the record with information from Maine's former employer,

---

[6]The four main types of janitorial work listed in the Dictionary of Occupational titles are also listed as either "medium" or "heavy" work.  *See Bean v. Barnhart*, 454 F.Sup.2d 616, 622 (E.D.Tex. 2006) (citing *Dictionary of Occupational Titles* §§ 381.687-014, 381.687-018, 382.664-010, 389.667-010 (1991), *available at* www.westlaw.com (database DICOT)).

BGM Industries, and to develop further Maine's testimony. *See Sells*, 48 F.3d at 1047; *Kirby*, 923 F.2d at 1327. If the ALJ finds Maine does not retain the ability to return to his past work, then the burden will shift to the Commissioner to prove other jobs exist in the national economy that Maine can perform. *Sells*, 48 F.3d at 1047.

For these reasons, Maine's claim must be remanded to the Commissioner for a new hearing including adequate development of the record regarding the exertional demands of Maine's past relevant work.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further development of the record.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of May, 2008.